Filed 9/1/22  P. v. Ortiz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUAN CASTRO ORTIZ,<br><br>Defendant and Appellant. | F081552<br><br>(Super. Ct. No. F15903393)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Gary D. Hoff, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Juan Castro Ortiz was charged with the first degree murder of Jose Fuentes-Martinez (Pen. Code,[1] § 187, subd. (a) [count 1]), possession of a firearm by a convicted felon (§ 29800, subd. (a)(1) [count 2]), and witness dissuasion in furtherance of a conspiracy (§ 136.1, subd. (c)(2) [count 3]).  The information further alleged that he served two prior separate prison terms (§ 667.5, subd. (b)) and—in connection with count 1—personally and intentionally discharged a firearm and proximately caused great bodily injury or death (§ 12022.53, subd. (d)) and committed the murder while he was engaged in the commission of a qualifying felony, i.e., robbery (§ 190.2, subd. (a)(17)).  At trial, the prosecution argued that defendant was the actual killer.  The jury found him guilty as charged and found true the special allegations.  Defendant received life without the possibility of parole (LWOP) plus 25 years to life for the firearm enhancement on count 1, a concurrent three years on count 2, and a consecutive three years on count 3.

On appeal, defendant makes three contentions.  First, "[his] LWOP sentence must be reduced to 25 years to life because state law and the double jeopardy clause prohibit dual use of the same conduct to support the offense and elevate the sentence."  (Boldface & some capitalization omitted.)  Second, "the [trial] court erred by excluding evidence of [a witness]'s pending charges to impeach his credibility."  (Boldface & capitalization omitted.)  Finally, "[t]he case should be remanded for the court to exercise its discretion to run the determinate sentence concurrent to the indeterminate term."  (Boldface & capitalization omitted.)  We conclude:  (1) use of the same felony to support a first degree murder conviction under a felony-murder theory and a felony-murder special circumstance finding is permitted; and (2) the purported evidentiary error was harmless.  In addition, we accept the Attorney General's concession that remand is warranted

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

because "the trial court failed to exercise its sentencing discretion to decide whether to impose consecutive or concurrent sentences . . . ."

## STATEMENT OF FACTS

### I.     Monique L.

Monique knew defendant since childhood.  On the evening of May 29, 2015, she and Joanna M.[2] were with defendant at his residence in Mendota when defendant told the women that he was going to give Fuentes-Martinez a ride home to Dos Palos.  Defendant asked the women to accompany him.  The three went in defendant's truck to a recreation area for boating and skiing where they picked up Fuentes-Martinez.  Defendant then drove to a gas station to refuel.  Monique sat in the front passenger seat while Joanna and Fuentes-Martinez sat in the back.  Monique noticed that the truck's transmission was "slipping" and suggested that someone else take Fuentes-Martinez home.  Using defendant's phone, she sent a text message to Frankie A.—a "really good friend"— asking him to give Fuentes-Martinez a ride, but he did not respond.  Afterward, the four resumed their trip to Dos Palos.

Upon arriving in Firebaugh, Fuentes-Martinez asked defendant to pull over so that he could relieve himself.  Defendant parked next to "a bunch of trees by a canal bank." Thereafter, Joanna and Fuentes-Martinez "came out like flying," the former striking the latter for touching her inappropriately.  Meanwhile, defendant grabbed a firearm.  He approached Fuentes-Martinez and demanded his wallet.  When Fuentes-Martinez refused and issued a challenge to fight, defendant shot him.

Defendant instructed Joanna to move Fuentes-Martinez's body because "[it] was right behind the truck and he wanted to get out of there . . . ."  She obeyed.  Defendant then instructed Monique to "guide him" while driving the truck in reverse, but she "was

---

[2] Prior to trial, Joanna passed away "for reasons having nothing to do with [the] case or . . . defendant . . . ."

3.

still in shock" and "frozen." He raised his gun and threatened to kill her if she did not comply. Ultimately, Joanna intervened and assisted defendant. The three left the scene and headed back to Mendota. Defendant drove to a park, where "[t]here's a couple dams" and "canal banks where people fish off." While the vehicle was still in motion, he had Monique toss his cell phone toward a canal.

Back at his residence, defendant "scrubb[ed] his arms with water and bleach" and "turned on his video camera and stuff." Per his orders, Monique and Joanna wiped the truck's interior and exterior with bleach. The women's shoes were confiscated and placed in a bag with defendant's "own clothes and his shoes . . . ." Defendant, who wanted the three of them to "have the same story," peppered the women with questions, e.g., "if the cops asked you where were you at on this night, what were you going to say and stuff like that." He also told Monique that "he would kill [her] kids and [her] dad if [she and Joanna] got away." At some point, the surveillance camera showed Frankie outside in a car. Defendant invited him inside. He asked Frankie to give him, Monique, and Joanna a ride to a party and to demonstrate how to delete surveillance footage from a digital video recorder (DVR). Frankie agreed to do both.

As the four were leaving defendant's residence, Monique pointed out that defendant's truck had a flat tire. She saw defendant's neighbor and asked him if he had a jack. The neighbor stated that he had one in the trunk of his car, which was parked nearby. He and defendant looked for the jack but could not find it due to the darkness. When defendant went inside to grab a flashlight, Monique implored, "Frankie, we got to get out of here." She "pushed [Joanna] into [Frankie's] car," "jumped on her lap," and "slammed the door." The three departed and Monique told Frankie what had transpired earlier that evening. Frankie dropped the women off at Monique's home. Monique reported the incident to her brother, who—in turn—called 911.

4.

In March 2016, Monique came across a Facebook post made by an account bearing defendant's name. The post contained photographs of Monique; her birthdate, home address, e-mail address, and phone number; statements that she "blamed [defendant] for a murder that he didn't even do" and was available to "play"; and various taunts. Monique contacted Detective Diaz of the Fresno County Sheriff's Office.

## II.     Frankie A.

On either May 29 or 30, 2015, Frankie plugged in his cell phone, which had a dead battery. Before he took a shower, he noticed a text message from Monique. Frankie called her cell phone, but she did not answer. He went to Monique's home and was told by her brother that she was with defendant. Frankie drove to defendant's residence and encountered defendant outside. The two went inside and Frankie noticed that Monique "had a look on her face like she was scared or something was wrong." Defendant asked him "if [he] knew how to delete . . . surveillance videos from his DVR . . . ." Frankie "said yeah" and "deleted everything." He, defendant, Monique, and Joanna then smoked methamphetamine. At some point, defendant washed his hands "up to the elbow" with "some bleach and a bar of soap." Later, he asked Frankie to "give him a ride or help him change a tire to his car." Frankie "told him [he]'d help him change the tire to his car."

After the four went outside, Monique saw defendant's neighbor and asked him if he had a jack. The neighbor stated that he had one but needed a flashlight to find it. When defendant went back inside to grab one, Monique said, "[L]et's go, let's go, let's go, let's go." Once she "pushed [Joanna] to the back seat" and got in the front seat, Frankie drove off. Monique told him what had transpired earlier that evening and he advised her to "either call the cops or tell her brother what had happened."

**III. Law enforcement**

a. *Initial dispatch*

In the wee hours of May 30, 2015, Deputy Hanson of the Fresno County Sheriff's Office and Officers Casas and Tsaris of the Mendota Police Department convened at Monique's home. Monique disclosed "where [Fuentes-Martinez's] body was at" and she and Joanna agreed to go to the site with Hanson. Almost immediately after the three left the residence in Hanson's patrol vehicle, Monique spotted defendant and a female companion approximately "two blocks away from [her] house." She became "highly agitated" and "extremely scared." Hanson contacted Casas and Tsaris. The officers contacted defendant and his companion, conducted pat-down searches, and retrieved a .22-caliber handgun from defendant's left pocket and a loaded magazine from the companion's left waistband.

Thereafter, Monique directed Deputy Hanson to the site of the shooting. Hanson turned on his vehicle's spotlight and saw Fuentes-Martinez's body. A .22-caliber bullet was later extracted from the chest and forensic testing revealed it had been fired from the handgun found in defendant's possession and from a distance of "[a]t least two-and-a-half feet."

b. *Interrogation*

Detectives Diaz and Stricker of the Fresno County Sheriff's Office commenced the interrogation in the afternoon of May 30, 2015. Diaz informed defendant that he was being charged with murder. Defendant insisted that he "did not do" "a murder." The following exchange occurred:

"[DEFENDANT].   You saying this crime occurred on the outskirts, right?

"[DIAZ].          Absolutely.

"[DEFENDANT].   I never left Mendota.

"[DIAZ].          Okay.  Well, where [were] you this evening?

6.

"[DEFENDANT].     (No answer heard).

"[DIAZ].          Let's go back to this morning, okay, we'll start about this morning – excuse me, yesterday morning, we'll start there.

"[DEFENDANT].     Me personally . . . me, just me, myself, my body never left Mendota.

"[DIAZ].          Okay, that's fair.  Let's get into that, so yesterday morning – so today is Saturday, right?

"[DEFENDANT].     (No answer heard).

"[DIAZ].          Right, today's Saturday?

"[DEFENDANT].     (No answer heard)

"[DIAZ].          Yesterday morning would be Friday, you follow me?

"[DEFENDANT].     Uh, huh (affirmative).

"[DIAZ].          Yes?  Okay Friday morning, yesterday, what time did you get up in the morning, give or take?

"[DEFENDANT].     I don't remember.

"[DIAZ].          Okay, when you got up was the sun up or was it dark out?

"[DEFENDANT].     You know I gave you, I gave you something right now.

"[STRICKER].      (Chuckling).

"[DEFENDANT].     I told you that.

"[DIAZ].          All you told me was you never leave Mendota.

"[DEFENDANT].     Just me . . .

"[DIAZ].          I didn't . . .

"[DEFENDANT].     . . . me, myself, just my body never left Mendota.

"[DIAZ].          Okay.

7.

"[DEFENDANT].    That's it.

"[DIAZ].    So . . .

"[DEFENDANT].    What can you give me?  [¶] . . . [¶]

"[DIAZ].    How about this here, here you go.  I will give you a piece of paper . . . and I'm gonna give you a pen, okay.  We're gonna take a break.  You need to go to the bathroom?

"[DEFENDANT].    Yeah.  [¶] . . . [¶]

"[DIAZ].    What I'm gonna do is I'm gonna leave this piece of paper.  I'm gonna leave this pen right here, okay.  Once you're done with the bathroom I'll bring you back in here, alright.  Do with the piece of paper and the pen as you will, alright.  You, you understand me?

"[DEFENDANT].    Uh, huh (affirmative)."

After a short break, the following exchange occurred:

"[DIAZ].    . . . . Juan, this is one of those moments in life, right . . . where you're at a crossroads, brother.  You're at a crossroads, dude.  You're at a crossroads.  You have a choice right now what's it gonna be?  Stand up . . . defend yourself or lay down and see what happens?

"[DEFENDANT].    I'll just write something and that'll be the end of that.

"(LONG PAUSE)    [¶] . . . [¶]

"[DIAZ].    Take a break or you done?

"[DEFENDANT].    I'm done.

"[DIAZ].    Alright.

"[STRICKER].    You wanna initial at the bottom and date both of 'em?  Unless you signed them, I don't know if you signed them already.  [¶] . . . [¶]

"[DIAZ].    . . . Do you mind if I read it out loud?

"[DEFENDANT].    Go ahead.

"[DIAZ].          Okay.  Uh, Page One; *A girl came over to my place earlier in the day.  Me and that girl kicked it at my place all day.  Later in the day another girl, a friend of mine, wanted to come over.  So, she got dropped off by her friend at my place.  Before she got there I got a call from some guy, that guy asked me if I could give someone a ride to D.P.*  Is that Dos Palos?

"[DEFENDANT].    Uh, huh (affirmative).

"[DIAZ].          *That guy that called me said that the guy I was giving a ride to would pay me thirty dollars for gas.  So I said, 'Okay.'  When me and the girl that I was kickin' it with* all day was getting ready to leave *the second girl that wanted to come over got to my place.  So, I told her that me and the first girl was going to pick someone up and take him to D.P. and if she wanted to go with us, she . . . she said, 'Okay.'  So, all three of us go and pick up this guy, when we get there the first guy that asked me to give him a ride to me –* I'm sorry.  Uh, so I'll start from the next sentence.  Sentence four; *When we got – when we get there the first guy that asked me to give him a ride to me in my ear . . .*

"[DEFENDANT].    Told me.

"[DIAZ].          I'm sorry.

"[DEFENDANT].    Told me.

"[DIAZ].          *Told me in my ear that the guy I was giving a ride to had a lot of money and that on the way I . . . could rob him.  I didn't say anything back, but I did think about it.  I told the two girls that was with me about what . . . was just said to me.  The two girls seemed to be interested, so we ended up at [a gas station] putting gas.  I was telling the girl that showed up second at my place that I don't think I want to rob this guy.  She seemed to agree but asked if, if they – her and the other girl can.  I said, 'Well, if you do it with me . . .*

"[DEFENDANT].    And it was in there.

9.

"[DIAZ].            *. . . with me with you guys it's the same thing as me doing it myself. So, she asked if she can use my ride to take that guy and her and the other girl would do it and they would give me half of whatever they get. I said, 'Okay.' But since they were both girls, I said that I can . . . borrow a gun for them to take just in case. She asked if she could borrow my phone to see if one of the other guy friends would also go with them just in case. But that they would only give the other guy they take a small cut. So, I said, 'Okay.' But that I also would pick up that gun for them on the west side. So, we all went to pick the gun. After that they dropped off at my place then said if they could also use my phone just in case, cause neither one of the two girls had a phone. And that they were gonna be right back fast anyways. So, I just let them take the phone too, why not I was gonna be fast – it was gonna be fast money and I didn't have to do anything. So they left. I guess one of them girls also picked up one of their guy friends cause they – cause when they got back one of their guy friends was with them. All three of them came into my room and the guy asked if he can wash his hands. I said, 'I can't take you inside, I'll just let you just walking all through the backyard making noise cause my family was asleep.' So, I went to the backyard myself to get him a bucket of water to wash his hands. He used some of the soap I had so I asked the girl to use my ride and phone. I'm sorry; I asked the girl that asked to use my phone, my ride and phone, 'Where's my money?' She said that the guy they robbed didn't have shit, so I was a little upset cause they used my ride and phone to do everything. So, I asked for the gun back so I can take it back to the guy it belongs to. They gave the gun back to me but said that my ride had a flat. That's when I got mad started talking shit to all three of them. I told all three of them to take off walking. After that I took off walking to the west side to take the gun back to the person I borrowed it from, that's when I bumped into some other girl I know, so I asked her to walk to the west side with me, she said, 'Okay.' But when we almost there we saw a lot of cops around, so I told the girl that I was walking with, 'Fuck all this, let's just go*

10.

*back to the east side.' So, that's when we did, but on the way that's when we got stopped by the law. I didn't even know there was a murder till I was told that I was being charged with while being investigated. I didn't want to say anyone's name cause I don't want to be called a snitch. But the question that need to be found out is who was there, who was these two girls and other guy and which one of the three really did the killing. I might be guilty of some things but not murder.* Signed; Juan Ortiz. Did anybody make you write this?

"[DEFENDANT].   No.

"[DIAZ].   No. Were any promises made to you to write this?

"[DEFENDANT].   No."

The interrogation continued for several more hours. Finally, defendant accused Joanna of shooting Fuentes-Martinez. The following exchange occurred:

"[DEFENDANT].   [Joanna] shot that dude.

"[DIAZ].   How do we know this?

"[DEFENDANT].   [Joanna] had the gun. [Joanna] wanted to do this, [Joanna] was the one in the backseat with him. [Joanna] was the one who had all the motivation, all the determination to get this done. [Joanna] just got out of prison and don't got shit . . . at my house all day talking about it, she had all this determination to get this done once she found out by – when the girl told her something, that's why I told 'em, 'Bullshit, shut the fuck up.' But what she knew and what – you know what I'm saying, and fuckin' . . . once she got that idea in her head it was a wrap. She wanted to get this done. She was fuckin' hitting this fool in the face, it was on his face you know, made him bleed, but they did not knock his ass down. So, she starts defending himself. [¶] . . . [¶]

"[DIAZ].   How do you know this?

"[DEFENDANT].   I can't back that truth up.

11.

"[DIAZ].            Humph.

"[DEFENDANT].    So, it makes no difference.

"[DIAZ].            It does, it makes a big difference, okay?  Were you or were you not on the canal bank . . . with the guy that got killed, yes or no?  [¶] . . . [¶]

"[DEFENDANT].    No, I was not.  [¶] . . . [¶]

"[DIAZ].            Okay.  Well, if you weren't there that night or when this happened, how then do you know what you just told me about [Joanna] and the gun and everything else, how do you know it then if you weren't there?

"[DEFENDANT].    Cause it was explained to me by somebody who was there.

"[DIAZ].            Who?  [¶] . . . [¶]

"[DEFENDANT].    Monique told me everything.

"[DIAZ].            What did Monique tell you?

"[DEFENDANT].    What I just told you."

c.  *Involvement of Sylvia G.*

After Detective Diaz was contacted by Monique about the Facebook post (see *ante*, at p. 5), he authored a search warrant for records related to the account that had made the post.  Those records led Diaz to Sylvia, defendant's sister.  On August 16, 2016, a search was conducted at Sylvia's residence.  There, investigators found a blue plastic bin filled with letters and other notes written by defendant.

An envelope marked "CD" and addressed to Sylvia contained a 10-page missive.  The first few pages read:

"I wrote out Joe's statement that I want him to give to my attorney's investigator.  This is a story I will like him to say on the stand at my trial.  If he is willing, then cool[!]  I should beat my case.  But if for some reason he don't want to do it, then we have to find someone who's willing to tell this story.  They will just have to make little changes to the story like the time I showed up at their place.  Remember I need to know the exact time

12.

on how long it takes to dive [*sic*] out of [the gas station] and park right across the street from [a fast-food restaurant]. Then I need to know the exact time it takes to walk from across the street from [the fast-food restaurant] to Joe's apartment door. The exact time was 9:24 p.m. when my truck was seen on video leaving the [gas station]. I wrote out my statement in a way so that if there's any changes to the story then you can let me know. For example, on page 6 of 10, line 4 in parenthesis, dude off in Firebaugh. Say you wanted to change the word Firebaugh to Dos Palos, you would say page 6 for page 6 of 10 and line 4 for line 4, or L4 for line 4, then you would say 4 across is now Dos Palos. Four across is now the fourth word in line four which was Firebaugh, not it's Dos Palos. That's just for example. So you would say it like this: Page 6, L4, 4 across is now Dos Palos. But this would most likely have to be done over the phone, because if you put all that in a letter, it most likely won't come in because they will say it's code talk, which it is, but over the phone there's nothing they can do to stop it or prove what we're even talking about.

"I have my own handwritten copy of Joe's statement written the exact same way, so I will know exactly what you talking about. In fact, I have an exact handwritten copy of everything you're getting in this envelope. If Joe don't want to do this, then maybe Jesse . . . might.

"When you give Joe this letter and a statement, also give him a copy of the transcripts to [Joanna]'s interviews. Give him a copy of all the transcripts that I send you. Also be sure to make a copy of Joe's letter and his statement for your own records or files.

"As for [my neighbor], I just need him to say at no time did anyone ask for a flashlight and when the two girls and the guy . . . . [¶] . . . [¶] . . . left, they didn't seem to be in a hurry or scared.

"At exactly 12:53 a.m. [my neighbor] is no longer seen on camera because he's in front of his house at this moment in time. At this exact moment you can see the back lights to Frankie's car, so that's when they left. So [my neighbor] seen when they drove off because Frankie's car was parked in front of [my neighbor's] house, but in the middle of the street. But I'll send you a copy of [my neighbor's] transcripts so you can make a copy to give to [my neighbor], that way he knows exactly what he said the first time when they talked to him. That way he don't get his words twisted.

"Also I'm sending you Monique's statement just in case she's willing to flip the script, be on my side and throw [Joanna] under the bus, page 8 of 10.

"I also have a letter for Monique to page 7 of 10. I want you to give Monique's letter to cousin Linda and tell Linda to get a hold of Monique so that them two can meet. Then tell Linda to read the letter to Monique, but do not give Monique the letter. Once all of that is done and Monique agrees to flip the script and side with me, then either you, Linda or someone I trust can meet with Monique. I would want Monique to make her own handwritten copy of my statement. I don't want her to have anything in my handwriting. What I know about Monique, I think she would be willing to do this, but we just have to play it safe. These are the code names for everyone. [¶] . . . [¶]

". . . When you talk about Monique's[/]Francesca's new statement, you would say Francesca's favorite movie or the movie Francesca likes. After Monique's letter is read to her, make sure you get it back. Everything in this envelope would be called the CD, so when I ask if you got the CD, you know what I'm talking about. Also, if Monique agrees to give the new statement, then she's going to have to know how I told the story to Joe when I went to his apartment, things like the gun being in the speaker box, because them little details and Monique's and Joe's statements have to match up. . . ."

The fourth page read:

"Joe, as you know, they got me on this 187. Look, homie, I need your help. I need you to be my alibi. I can tell my attorney to have her investigator go out there and ask you some questions. I already wrote out your statement for you. Everything fits perfectly[!] My mom will give you a copy of the transcripts to everyone's statements so you know exactly what's going on and all that was said. Say, homie, if you do this for me, you already know what time it is with me. Anything you need or want done I got you[!] I know you understand what language I'm talking[!] If you're willing to do this for me, then cool, but it's not a good idea for us to have direct conduct. Your homie, Duck Mendota.[3] And just remember, you don't have to talk to the DA's investigator either. The DA won't even know about you until 30 days before the trial."

The fifth and sixth pages contained the aforementioned statement:

"On 5/29/15 Duck had knocked at my door at blank p.m. I remember because that was the first thing he asked of me, what time was it[?] After I told him what time it was, he asked if it was too late for him to come inside to talk to me. I really didn't want to let him inside because he was acting a

---

[3] The record indicates that "Duck" is defendant's nickname.

14.

little strange like paranoid. So I told him that we can talk right here in front of my door. Then he asked if he could use my phone to call his phone. I asked him where was his phone at. He said he left it in his truck. I asked him where was his truck. He said Monique and [Joanna] have it. I asked him what were they doing with his truck. Then he started telling me how some dude named John asked him if he could give some other guy a ride to Dos Palos for $30. A[nd] right when him and [Joanna] was about to leave Monique showed up, and he said that Monique showed up with his gun. He said cuz earlier in the day he was tripping, thinking that the cops were going to raid his house, so he said he put his gun in a speaker box and took the speaker box to Monique's house for her to hold it for a while. Well, when Monique showed up with his gun, she tried to give it back to him, but he told her to just hold it for right now because he was kind of in a hurry to go pick up this guy that needed a ride to Dos Palos. Then Duck said that him, Monique and [Joanna] went to go pick up the guy that needed the ride. Then he said that when they picked him up that John told Duck that the guy he was giving a ride to Dos Palos had a lot of money and that Duck could rob him if he wanted to. Well, Duck said that after they left [the recreation area], he started hallucinating again, seeing shadows in the road. Duck said that Monique and [Joanna] were talking about robbing the dude that Duck was giving a ride to Dos Palos, but Duck told them to shut that shit down because Duck said that he wasn't even tripping on robbing anyone because he was tripping on the shadows. He said that when he got close to [the fast-food restaurant] he saw a shadow sitting between him and Monique, so he pulled over real fast, got out of the truck and told Monique just take him, just take him. He said that because when he . . . . [¶] . . . [¶] . . . seen the shadow sitting right next to him he freaked out. But his phone was left in the truck. He said he wanted to call his phone and tell Monique to drop that dude off in Firebaugh and bring his truck right back to his house. I told him that my phone was dead right now, talking in front of my apartment for a little while. He was telling me something about how some girl threw his meds in the street and how lately he's been hallucinating. After a little while he said that he was going to go back home and wait for Monique and [Joanna] to bring his truck back."

The seventh page—a "letter for Monique"—read:

"I just want to let you know that I ain't mad at how everything went down. Looking back at everything I guess I can understand why you guys might thought I want to kill you guys. But look, now the rest of my life is on the line. I don't want you to feel that I might want to hurt you in any kind of way. What I do want is your help. Look, I got my story well thought out and someone to back up my story. If you flip the script for me, I got your

15.

new statement already wrote out and is already out there in the streets. It covers everything, makes perfect sense and justifies your reasons for lying in your first statement. But, yeah, [Joanna] is being thrown under the bus with or without your help. What would make your story and my story believable is that they match and there is no way to prove we had any contact and put this story together. And I'll tell like this: If you team up with me, no matter if I win or lose, either way you've got a soldier for life. That's my word."

The eighth and ninth pages contained the aforementioned statement:

"After we left [the recreation area], Duck starting tripping thinking he almost ran something over. And when we got by [the fast-food restaurant] he pulled over real fast and got out of the truck real fast. Then he tells me just take him, just take him, and he started walking away from the truck kind of fast. So I slid over to the driver side and just drove off. But then I pulled over at this little store on the left side right before you cross the tracks so [Joanna] or the guy can get in the front. When I pulled over there was this guy I know standing right there from MS13. We talked real quick and I asked him if he wanted to take a ride with us, that we were just coming right back. He said yes, so I told him, well, you drive then because I didn't want to be the one driving Duck's truck in case we got pulled over, plus I still had Duck's gun because I was kind of tripping on that because I didn't want to be holding it. That's why I was trying to take it back to him in the first place. So then I'm in the passenger seat and that guy from MS13 is driving Duck's truck. [Joanna] starts telling the guy driving in English that the guy in the back seat had some money and they should rob him, because John told [Joanna] the guy had a lot of money. After they talked about it for a little bit, by the time they got to Firebaugh the driver ends up turning left, and when we got out there, that's when everything happened. This whole time I had the gun under my shirt, so when I had to get out of the truck to let [Joanna] and the guy out from the back seat, I pulled the gun out because it was uncomfortable to move around like that. So when I pulled the seat up to let them out the back seat, [Joanna] saw the gun in my hand. She said let me see that and just grabbed it from my hands. The drive[r] got off the truck too, but that's when [Joanna] shot the guy that was in the back seat with her.

"On our way back to Mendota, the guy that was driving got dropped off on the east side on our way to the [park].

"When we got back to Duck's house we told him what happened. At first he was trying to help us out telling us to give him our shoes so he could get rid of them. He even changed his clothes to[o] cuz he said the

16.

cameras at [the gas station] saw him too. . . .  But as far as I know, he had the same shoes on.  He even told [Joanna] to wash her hands and gave her a bucket of water.  But then he starts getting mad when we told him about his phone.  He made us go outside to clean his truck, then we went back inside, but he was all pissed off because he saw that the truck was flat.  Then Frankie gets there.  After we all went outside again, Duck was going to try and fix the flat.  At one point Duck asked him in the hell did you guys get a flat[?]  Then I said the guy must have ran something over.  Then Duck was like what [!?]  You let some dude drive my truck[!?]  Duck was like fuck, now I'm going to go get my gun, so when he went inside we left.  I don't know if he was going to get the gun for us or for the guy that drove his truck.  So we were all scared.  So after we drove off, we got our story together so Duck would be the one to go to trial, because if he was going to go try and kill us, then I'd rather him be the same one to go to jail for killing that guy.

"As for the guy from MS13, last I heard he went back to Mexico."

A letter addressed to Sylvia and signed by defendant instructed the former to make a Facebook post about Monique and specified the information to be publicized.  In a second letter addressed to Sylvia and signed by defendant, the latter asked, "Hey, did you ever post that picture of Monique with all that shit that I wrote on it[?]  [¶] . . . [¶]  . . . If so, was there any likes or comments[?]"  Another letter addressed to Sylvia and signed by defendant instructed the former to make another Facebook post and upload photographs of Monique and Joanna as well as transcripts showing that the women "point[ed] at [defendant] when they were in the cop car while [he] was getting arrested."

At trial, Sylvia—who was convicted of felony witness intimidation (§ 136.1) in 2017—testified that she made the Facebook post about Monique per defendant's request.

d.  *Additional items of interest*

Deputies found a bucket of water, a bottle of bleach, soap, .22-caliber bullets, and a gun case at defendant's residence.  They found "cleaning material" inside and/or around defendant's truck.  Deputies later found remnants of the cell phone in or near a canal at the park.

# DISCUSSION[4]

## I.     Use of the same felony to support a first degree murder conviction under a felony-murder theory and a felony-murder special circumstance finding is permitted.

### a.  *Relevant law*

#### i.   First degree murder on theory of felony murder

"Section 189 imposes culpability for first degree murder when a killing is committed during the commission or attempted commission of a statutorily enumerated felony." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80 (*Andreasen*).)  Robbery is one such felony.  (See § 189, subd. (a).)

"Effective January 1, 2019, the Legislature passed Senate Bill [No.] 1437 [2017-2018 Reg. Sess.] 'to amend the felony murder rule . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959, quoting Stats. 2018, ch. 1015, § 1, subd. (f).)  Accordingly, the Legislature added the following language to section 189:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer. [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e); accord, *People v. Prado* (2020) 49 Cal.App.5th 480, 488.)

---

[4] To the extent defendant raises points for the first time in his reply brief, we decline to address them.  (See *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."].)

ii. Punishment for first degree murder

"Section 190 provides that first degree murder 'shall be punishable by death, imprisonment in the state prison for [LWOP], or imprisonment in the state prison for a term of 25 years to life,' with the penalty to be determined as provided in certain statutory provisions" (*Andreasen*, *supra*, 214 Cal.App.4th at p. 80), i.e., "Sections 190.1, 190.2, 190.3, 190.4, and 190.5[5]" (§ 190, subd. (a)).

"A case in which the death penalty may be imposed . . . shall be tried in separate phases . . . ." (§ 190.1; accord, *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467 (*Bacigalupo*).) "The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 . . . ." (§ 190.1, subd. (a);[6] see § 190.4, subd. (a).) Section 190.2 lists "22 special circumstances that determine eligibility for the death penalty or [LWOP] in murder cases" (*People v. Secrease* (2021) 63 Cal.App.5th 231, 248, overruled in part by *People v. Strong* (2022) 13 Cal.5th 698, 709-710), including felony murder (§ 190.2, subd. (a)(17)). "[T]he special circumstances serve to ' "guide" ' and ' "channel" ' jury discretion 'by strictly confining the class of offenders eligible for the death penalty.' [Citation.]" (*Bacigalupo*, *supra*, at p. 467; see *People v. Montes* (2014) 58 Cal.4th 809, 874 [" '[S]pecial circumstance are *sui generis*—neither a crime, an enhancement, nor a sentencing factor.' "].) "If the trier of fact finds at least one alleged special circumstance to be true, the case proceeds to the 'penalty' phase of the trial." (*Bacigalupo*, *supra*, at p. 467; see §§ 190.3, 190.4, subd. (a).)

---

[5] Section 190.5, which pertains to a defendant "who is under the age of 18 at the time of the commission of the crime" (*id*., subd. (a)) does not apply in the instant case.

[6] Section 190.1, subdivision (a) exempts special circumstances "charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree."

"The sole purpose of the penalty phase is to select the punishment for a defendant who has been found to be within the narrowed class of murderers for whom death would be an appropriate penalty." (*Bacigalupo*, *supra*, 6 Cal.4th at p. 468.) "At this stage in the proceedings, '[a]dditional evidence may be offered and the jury is given a list of relevant factors' from section 190.3 to guide it in deciding whether to impose a sentence of [LWOP] or a sentence of death. [Citation.]" (*Ibid.*; see § 190.3, subds. (a)-(k).) The trier of fact "shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." (§ 190.3.) "If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of [LWOP]." (*Ibid.*)

### iii. Felony-murder special circumstance

"[T]he felony-murder special circumstance applies if the murder was committed during the commission or attempted commission of a statutorily enumerated felony, and subjects the defendant to a sentence of death or of [LWOP]." (*Andreasen*, *supra*, at p. 80, citing § 190.2, subd. (a)(17); see § 190.2, subd. (a)(17)(A) [robbery].) A defendant must have either been the "actual killer" (§ 190.2, subd. (b)); acted with the intent to kill in aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of the murder (§ 190.2, subd. (c)); or been a major participant in the commission of the underlying felony and acted with reckless indifference to human life (§ 190.2, subd. (d)). "The requirements for the felony-murder special circumstance . . . are identical to the new requirements for felony murder following the enactment of Senate Bill No. 1437." (*People v. Galvan* (2020) 52 Cal.App.5th 1134, 1140, overruled in part by *People v. Strong*, *supra*, 13 Cal.5th at pp. 711-712, 718 & fn. 3.) "By finding a special circumstance allegation true, the jury makes precisely the same finding it must make in order to convict a defendant of felony murder under the new law." (*People v. Galvan*, *supra*, at p. 1141.)

b. *Analysis*

On appeal, defendant contends:

> "In this case, the concomitant robbery was the sole theory supporting both the murder degree and the special circumstance finding. As a result, the increased sentence was based on an element of the offense in violation of [1] state law and [2] The Double Jeopardy Clause. As a result, the sentence on count 1 must be reduced from LWOP to 25 years to life."

We address each point separately.

### i. State law claims

At the outset, defendant cites former rule 4.420(d) of the California Rules of Court, which is now rule 4.420(h). It reads: "A fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term." This rule, however, provides "[f]urther guidance for determinate sentencing" (*People v. Neely* (2009) 176 Cal.App.4th 787, 798), which "is governed by sections 1170 and 1170.1" (*id.* at p. 797). By contrast, "[s]entencing for the indeterminate crime of murder is governed by section 190 . . . ." (*Ibid.*) Thus, rule 4.420(h) does not apply in the instant case.

Next, defendant cites *In re Shull* (1944) 23 Cal.2d 745 (*Shull*) and *People v. Edwards* (1976) 18 Cal.3d 796 (*Edwards*). In *Shull*, the defendant was convicted of assault with a deadly weapon and sentenced to a 10-year prison term pursuant to former section 245. (*Shull*, *supra*, at p. 747.) An additional consecutive five-year term was imposed under section 3 of the Deadly Weapons Act. (*Shull*, at p. 748.) The California Supreme Court concluded that the Legislature did not intend for this five-year term to apply to a defendant convicted of assault with a deadly weapon. (*Id.* at p. 749.) It reasoned:

> "It is apparent that section 245 of the Penal Code is a specific provision. It defines and determines the punishment for a specific kind of a crime, assault with a deadly weapon, in the instant case, a pistol. On the other hand, section 3 of the Deadly Weapons Act which imposes the additional penalty refers to no particular crime, but purports to require an added punishment for felonies generally where the one committing the same is

21.

armed with a pistol or the other weapons designated therein and in section 1.  It is the general rule that a special statute controls over a general statute.  [Citation.]  It is not unreasonable to suppose that the Legislature believed that for felonies in which the use of a gun was not one of the essential factors, such as rape, larceny, and the like, an added penalty should be imposed by reason of the fact that the defendant being armed with such a weapon would probably be more dangerous because of the probability of death or physical injury being inflicted by the weapon. . . . [T]he Legislature has fixed the punishment for an assault where a deadly weapon is used, a particular crime, and it is not to be supposed that for the same offense without any additional factor existing the added punishment should be imposed.” (*Shull*, *supra*, 23 Cal.2d at pp. 750-751.)

In *Edwards*, the defendant was convicted of a felony, i.e., selling marijuana.  Four years later, he was convicted of possession of a firearm by a convicted felon, a violation of former section 12021, subdivision (a) that ordinarily carried a minimum term of six months.  (*Edwards*, *supra*, 18 Cal.3d at pp. 798-800 & fn. 3.)  However, the trial court “purported to pronounce judgment in a manner which would have augmented defendant’s sentence pursuant to [former] section 3024, subdivision (c)” (*id.* at p. 800), which imposed a minimum term of two years “ ‘[f]or a person previously convicted of a felony’ ” (*id.* at p. 800, fn. 5).  The California Supreme Court highlighted this “obvious error” (*id.* at p. 800):

> “The court’s reliance on defendant’s prior conviction for the dual purpose of augmenting sentence and providing an essential element of the charged offense . . . runs afoul of the established rule that when a prior conviction constitutes an element of criminal conduct which otherwise would be noncriminal, the minimum sentence may not be increased because of the indispensable prior conviction.  [Citations.]  Here, proof of defendant’s marijuana conviction may be used *only* to establish an element of a violation of section 12021 and *not* to increase the term of the sentence under section 3024.” (*Edwards*, *supra*, 18 Cal.3d at p. 800.)

In support of its rationale, the high court cited *Shull*, among other cases.  (See *Edwards*, *supra*, 18 Cal.3d at p. 800.)

The following rule is distilled from *Shull* and *Edwards*:  “a single fact may not be used both as an element of the current offense and as the basis for imposition of more

22.

severe punishment than would otherwise be prescribed for the offense." (*People v. Tillman* (1999) 73 Cal.App.4th 771, 780.) This "*Edwards/Shull* rule" (*id.* at p. 786) relies upon the general principle of statutory construction that "specific statutes control over general ones" (*id.* at p. 784). Currently, courts are split on whether the *Edwards/Shull* rule has been abrogated by the enactment of the state's determinate sentencing law in 1977. (See *People v. Baird* (1995) 12 Cal.4th 126, 130-131; *People v. Tillman*, *supra*, at pp. 775-777.)

Assuming, arguendo, that the *Edwards/Shull* rule remains viable, we conclude that it does not apply in the instant case. As noted, the rule is derived from the following general principle of statutory construction:

> "In the construction of a statute the intention of the Legislature . . . is to be pursued, if possible; and when a general and [a] particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it." (Code Civ. Proc., § 1859.)

"The principle that a specific statute prevails over a general one applies only when the two sections cannot be reconciled." (*People v. Wheeler* (1992) 4 Cal.4th 284, 293.) Unlike the provisions involved in *Shull* and *Edwards*, the statutes at issue here (see *ante*, at pp. 18-20) constitute an "integrated scheme" (*People v. Melton* (1988) 44 Cal.3d 713, 768) to determine "the single appropriate punishment for the most serious offense—a first degree murder" (*ibid.*). (See *People v. Balderas* (1985) 41 Cal.3d 144, 200, fn. 27 (*Balderas*) ["Indeed, section 190, part of the 1978 death penalty initiative, defines first degree murder as a *single offense* whose *punishment* shall be 'death, confinement in the state prison for [LWOP], or confinement in the state prison for a term of 25 years to life,' the penalty to be 'determined as provided in' sections 190.1 through 190.5. These statutes clearly imply that *punishment* for the *single offense* of first degree murder depends on whether one or more statutory special circumstances are alleged and proved. If not, the 25-to-life penalty applies; if so, the death-or-[LWOP] penalties apply."].)

Defendant also cites *People v. Arroyas* (2002) 96 Cal.App.4th 1439 (*Arroyas*), *People v. Briceno* (2004) 34 Cal.4th 451 (*Briceno*), and *Lopez v. Superior Court* (2008) 160 Cal.App.4th 824 (*Lopez*) for the proposition that use of the same misconduct, e.g., robbery, to support a first degree murder conviction under a felony-murder theory and a felony-murder special circumstance finding improperly "bootstrap[s]" punishment.

In *Arroyas*, the defendant was initially charged with vandalism in violation of section 594, subdivision (a) and alleged to have committed the offense for the benefit of, and in association with, a criminal street gang in violation of section 186.22, subdivision (b)(1). (*Arroyas*, *supra*, 96 Cal.App.4th at p. 1442.) "Under subdivision (b)(1) of section 186.22, an enhanced sentence of two, three, or four years may be imposed upon conviction of a gang-related felony." (*Id.* at p. 1444.) The information was later amended to charge felony vandalism pursuant to section 186.22, subdivision (d) (*id.* at p. 1442), which "provides an enhanced sentence of one, two, or three years for conviction of a gang-related felony or misdemeanor" (*id.* at p. 1444). Defendant subsequently pled guilty and admitted the gang enhancement allegation. (*Id.* at p. 1442.) On appeal, Division Two of the Second Appellate District was "unable to find any support for the position that a misdemeanor, converted to a felony by subdivision (d), may also be subject to the felony enhancement provided in subdivision (b)(1)." (*Id.* at p. 1448.) It reasoned:

> "While any felony may be punished under section 186.22, subdivision (b)(1), subdivision (d) presents an option to punish a felony differently than provided by subdivision (b)(1), and also provides an option to punish gang-related misdemeanors more severely. Although subdivision (d) allows the court to impose felony punishment for a misdemeanor committed with a gang-related purpose, nothing in the statute or in its stated purposes suggests an intention of the people of this state to bootstrap subdivision (d) misdemeanors into subdivision (b)(1) felonies as a means of applying a double dose of harsher punishment." (*Arroyas*, *supra*, 96 Cal.App.4th at p. 1445.)

In *Briceno*, the California Supreme Court held that "section 1192.7[, subdivision ](c)(28) includes within its ambit any felony offense committed for the benefit of a criminal street gang under the section 186.22[, subdivision ](b)(1) gang sentence enhancement" (*Briceno*, *supra*, 34 Cal.4th at p. 459), rejecting the interpretation of Division Three of the Fourth Appellate District that "limited the reach of section 1192.7[, subdivision ](c)(28) to the substantive felony offense of active participation in a criminal street gang, in violation of section 186.22[, subdivision ](a)" (*id.* at p. 458).[7]  The high court explained:

> "In so holding, we disagree with the Court of Appeal that this interpretation of subdivision (c)(28) is derailed by the language of section 186.22[, subdivision ](b)(1)(B) and (C).  The Court of Appeal was apparently concerned that if section 1192.7[, subdivision ](c)(28) made *all* gang-related felonies serious felonies, a defendant convicted of a gang-related felony would never be punished under section 186.22[, subdivision ](b)(1)(A), the sentence enhancement that applies where the defendant is convicted of a felony that is gang related, but would always be subject to the sentence enhancement for a serious felony that is gang related under section 186.22[, subdivision ](b)(1)(B), rendering section 186.22[, subdivision ](b)(1)(A) surplusage.  Not so.

> ". . . Section 186.22[, subdivision ](b)(1)(A) provides that a person convicted of 'a felony' that is gang related shall receive, at the court's discretion, an additional two-, three-, or four-year term at sentencing.  Section 186.22[, subdivision ](b)(1)(B) provides that a person convicted of 'a serious felony' that is gang related shall receive an additional five-year term at sentencing.  Section 186.22[, subdivision ](b)(1)(C) provides that a person convicted of a 'violent felony' that is gang related shall receive an additional 10-year term at sentencing.  Thus, section 186.22[, subdivision

---

[7] "Section 1192.7, subdivision (c) enumerates those felony violations that constitute serious felonies under California law.  Where a defendant has been convicted of a serious felony, reoffending may result in severe consequences:  certain prior serious felony convictions are strikes under the Three Strikes law [citations], and all prior serious felony convictions subject a defendant to an additional five-year sentence enhancement if the current offense is a serious felony [citation]." (*Briceno*, *supra*, 34 Cal.4th at p. 458.) "[S]ection 1192.7[, subdivision ](c)(28) broadly covers '*any* felony offense [that] violat[es] Section 186.22.' (Italics added.)" (*Id.* at p. 462.)

25.

](b)(1)(A), (B), and (C) speaks to an event that occurs in the current proceeding. Section 1192.7, subdivision (c), on the other hand, comes into play only if the defendant reoffends, at which time any *prior* felony that is gang related is deemed a serious felony. Thus, any felony that is gang related is not treated as a serious felony in the current proceeding, giving effect to section 186.22[, subdivision ](b)(1)(A). [Citation.]

"Not only does this interpretation give meaning to section 186.22[, subdivision ](b)(1)(A), (B), and (C), it also avoids the impermissible bootstrapping that would occur if any felony that is gang related is also deemed serious in the current proceeding. Specifically, while it is proper to define any felony committed for the benefit of a criminal street gang as a serious felony under section 1192.7[, subdivision ](c)(28), it is improper to use the *same* gang-related conduct *again* to obtain an additional five-year sentence under section 186.22[, subdivision ](b)(1)(B). . . ." (*Briceno*, *supra*, 34 Cal.4th at pp. 464-465.)

The high court cited *Arroyas* in its reasoning. (See *Briceno*, *supra*, 34 Cal.4th at pp. 462, 465.)

In *Lopez*, the defendant was arrested for being in the company of gang members after 10:00 p.m. while possessing open containers of alcohol, which violated three terms of a court injunction. He was charged with three counts of misdemeanor contempt pursuant to section 166, subdivision (a)(4). As to each count, the indictment further alleged that defendant committed the offense for the benefit of, at the direction of, and in association with a criminal street gang in violation of section 186.22, subdivision (d). (*Lopez*, *supra*, 160 Cal.App.4th at pp. 827-828 & fn. 3.) At the time of the case, subdivision (d) of section 186.22 provided:

" '[A]ny person who is convicted of a public offense punishable as a felony or a misdemeanor, which is committed for the benefit of, at the direction of or in association with, any criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison for one, two, or three years . . . .' " (*Lopez*, *supra*, 160 Cal.App.4th at p. 827, fn. 1.)

The defendant filed a demurrer, which was overruled by the trial court. (*Lopez*, *supra*, 160 Cal.App.4th at p. 828.) Division Three of the Fourth Appellate District issued a writ

26.

of mandate directing the lower court to issue a new order sustaining the demurrer in part (*id.* at p. 833), finding that "[t]he same 'gang-related conduct' is being [improperly] used first as *the* violation of the injunction and then used again to elevate that offense from a straight misdemeanor to the wobbler under section 186.22, subdivision (d)" (*id.* at p. 831). The court relied on both *Arroyas* and *Briceno*. (See *id.* at pp. 827-828, 829-832.)

We conclude that the *Arroyas*, *Briceno*, and *Lopez* "bootstrapping" rule does not apply to the instant case. Here, there was no coupling of two distinct penalties prescribed in two different statutory provisions for the same misconduct. As noted, the statutes at issue here (see *ante*, at pp. 18-20) comprise a coordinated arrangement to establish one suitable penalty for the first degree murder in question. (See *People v. Melton*, *supra*, 44 Cal.3d at p. 768; *Balderas*, *supra*, 41 Cal.3d at p. 200, fn. 27.)

Finally, defendant suggests that—following the enactment of Senate Bill No. 1437—the Legislature "did not intend for the same conduct to trigger first-degree murder liability and to further aggravate the sentence as a special circumstance." He refers to section 1 of the bill, which reads in part:

> "It is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

In view of this language, we agree with defendant that the Legislature "narrowed the definition of felony murder for the express purpose of eliminating harsh penalties for less culpable defendants." (Italics omitted.) However, adoption of his aforementioned stance would undermine this explicit purpose by sparing those who are actual killers (such as defendant) and clearly the most culpable from being considered for the death penalty or LWOP. We refuse to countenance such an absurdity.

27.

ii. Double jeopardy claim

"The Fifth Amendment of the United States Constitution, applicable to the states through the due process clause of the Fourteenth Amendment [citation], provides in relevant part that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb . . . .'  Article I, section 15 of the California Constitution similarly provides that '[p]ersons may not twice be put in jeopardy for the same offense . . . .' " (*People v. Carbajal* (2013) 56 Cal.4th 521, 533-534.)  "The United State[s] Supreme Court has held that the double jeopardy clause of the Fifth Amendment protects against, among other things, multiple punishments for the same offense." (*People v. Wader* (1993) 5 Cal.4th 610, 670, citing *North Carolina v. Pearce* (1969) 395 U.S. 711, 717; see *Jones v. Thomas* (1989) 491 U.S. 376, 381.)  "[I]n the multiple punishments context, th[e] interest [that the Double Jeopardy Clause seeks to protect] is 'limited to ensuring that the total punishment did not exceed that authorized by the legislature.'  [Citations.] The purpose is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments.  [Citation.]" (*Jones v. Thomas*, *supra*, at p. 381.)

The California Supreme Court has repeatedly rejected the argument that use of the same felony to support a first degree murder conviction under a felony-murder theory and a felony-murder special circumstance finding violates the federal double jeopardy clause. (See, e.g., *People v. D'Arcy* (2010) 48 Cal.4th 257, 299; *People v. Webster* (1991) 54 Cal.3d 411, 455-456; *People v. Marshall* (1990) 50 Cal.3d 907, 945-946; *Balderas*, *supra*, 41 Cal.3d at p. 200.)  "The decisions of [the California Supreme Court] are binding upon and must be followed by all the state courts of California." (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

**II.** **Even if the trial court improperly excluded evidence of impeachment, the purported error was harmless.**

a. *Background*

At the time of trial, Frankie was charged with armed assault and alleged to have personally produced and aimed the handgun. Prior to his testimony, the following exchange occurred:

> "THE COURT: We have any issues of cross-examination based upon arrests for subsequent history, subsequent to this case?
>
> "[DEFENSE COUNSEL]: I can anticipate going there unless I'm ordered not to. This particular page shows this guy is now involved in another armed robbery against somebody and he's one of the people that's seen after this alleged murder by my client in the same room that my client was holding a .22 with a banana clip. Yeah, I definitely would like to inquire as to his peacefulness.
>
> "[PROSECUTOR]: Your Honor, my argument is that [Frankie], one, this is four years after the events. [Frankie] is, has just been arraigned today. There have been no charges proven nor have there even been a finding by a magistrate of probable cause at a preliminary hearing. I don't believe that this would be proper impeachment of the witness given the state of events, and there has been no allegations that [Frankie] was involved either by . . . defendant in his statement to law enforcement or by [Monique] who is the eyewitness of the case other than coming over to . . . defendant's house at a later time which we also saw documented in the video."

Thereafter, the court pronounced:

> "All right. Having at least heard those arguments up to this point in time, the Court is going to exclude any questioning of [Frankie] as to any possession or use of a weapon subsequent to the dates of the incident in this case on trial in this department. The Court's finding that's not relevant nor is it admissible, and he could certainly be questioned as to his involvement in this case on trial, whether he had a weapon or not at any point in time or what his involvement, if any, was at any part of the relevant time period of the circumstances of this case, but his current case and what his charges are and the fact that he's been arrested for certain charges and that he is pending trial on certain charges is not going to be admissible in this trial."

b. *Analysis*

Assuming, arguendo, that the court should have allowed defense counsel to cross-examine Frankie regarding his armed assault charge, its decision not to do so did not constitute prejudicial error. By constitutional mandate, "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of . . . the improper admission or rejection of evidence, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); accord, *People v. Callahan* (1999) 74 Cal.App.4th 356, 363.)

Here, even if defense counsel were allowed to cross-examine Frankie about the pending charge and Frankie's limited testimony were discredited, it is not reasonably probable that defendant would have obtained a more favorable verdict. Monique, the prosecution's chief witness, testified that defendant (1) tried to rob Fuentes-Martinez at gunpoint and shot him when he resisted; (2) had her get rid of his cell phone near a canal; (3) took off his clothing and shoes and collected her and Joanna's shoes for disposal; (4) washed his arms with water and bleach; (5) had the women scrub his truck with bleach; (6) coached the women; and (7) threatened the women. Sometime later, when Monique spotted defendant in close proximity to her home, Deputy Hanson observed that she became "highly agitated" and "extremely scared." When Officers Casas and Tsaris apprehended defendant, the murder weapon was found on his person. Subsequently, cell phone remnants, bleach, and other items of interest were recovered at pertinent locations. Documents authored by defendant himself revealed his elaborate attempts to manufacture an alibi and suppress incriminating evidence. He drafted statements for potential alibi

30.

witnesses (including Monique if she was "willing to flip the script") that more closely matched up with the one that he furnished at his interrogation. Defendant instructed his sister Sylvia to secure the cooperation of these witnesses; inform him about certain details that would help his account appear more accurate as well as "any changes to the story" that needed to be implemented; and utilize code words and shorthand to avoid detection by law enforcement. (See *People v. Allison* (1966) 245 Cal.App.2d 568, 576 ["An attempt to fabricate an alibi is admissible as an implied admission of consciousness of guilt."].) Finally, he had Sylvia publish Monique's personal information and photographs and incendiary remarks attributed to her on Facebook. (See *People v. Kendall* (1952) 111 Cal.App.2d 204, 213 ["Efforts to suppress testimony against himself indicate a consciousness of guilt on the part of a defendant, and evidence thereof is admissible against him."].)[8] Given the overwhelming evidence of defendant's guilt, it is highly likely the jury still would have convicted him of first degree felony murder.

**III. The case shall be remanded for resentencing.**

At the sentencing hearing, the trial court imposed LWOP plus 25 years to life for count 1 and the firearm enhancement, a concurrent three years on count 2, and a concurrent three years on count 3. The prosecutor opined that the three-year term on count 3 could not "run concurrent to an indeterminate term." The court modified its order and imposed a consecutive three years on count 3.

On appeal, defendant argues that "[t]he case should be remanded for the court to exercise its discretion to run the determinate sentence concurrent to the indeterminate term." (Boldface & capitalization omitted.) The Attorney General agrees, noting that "[t]he record indicates the trial court was under [the] impression that it had to impose a

---

[8] As noted, defendant was convicted of witness dissuasion in furtherance of a conspiracy. (See *ante*, at p. 2.)

consecutive sentence for an indeterminate and determinate term after being directed by the prosecution to do so." We accept this concession.

## DISPOSITION

The matter shall be remanded for resentencing. The trial court shall exercise its discretion and determine if the determinate terms are to be concurrent with or consecutive to the indeterminate term. Where appropriate, the abstract of judgment shall be amended and forwarded to the proper authorities. In all other respects, the judgment is affirmed.

DETJEN, J.

WE CONCUR:

POOCHIGIAN, Acting P. J.

PEÑA, J.